RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0074p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

PAUL BRUNNER, KAREN BRUNNER, and DOUGLAS
OTTE,

*Plaintiffs-Appellants*
*(05-3191),*

            *v.*

PAMELA HAMPSON, Executor of the Estate of Jerry
Jay Hampson, Deceased,

*Defendant-Appellant*
*(05-3123),*

CANADA NORTH OUTFITTING, INC. and JEROME
KNAP,

*Defendants-Appellees.*

Nos. 05-3123/3191

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 03-00723—George C. Smith, District Judge.

Argued: December 8, 2005

Decided and Filed: February 28, 2006

Before: DAUGHTREY, GILMAN, and SUTTON, Circuit Judges.

---

## COUNSEL

**ARGUED:** Mark R. Riegel, DAGGER, JOHNSTON, MILLER, OGILVIE & HAMPSON,
Lancaster, Ohio, Robert G. Palmer, ROBERT GRAY PALMER CO., Columbus, Ohio, for
Appellants. Sandra J. Anderson, VORYS, SATER, SEYMOUR & PEASE, Columbus, Ohio, for
Appellees. **ON BRIEF:** Mark R. Riegel, DAGGER, JOHNSTON, MILLER, OGILVIE &
HAMPSON, Lancaster, Ohio, Robert G. Palmer, ROBERT GRAY PALMER CO., Columbus, Ohio,
for Appellants. Sandra J. Anderson, VORYS, SATER, SEYMOUR & PEASE, Columbus, Ohio,
for Appellees.

1

_____

**OPINION**

_____

RONALD LEE GILMAN, Circuit Judge.  This diversity-of-citizenship case was filed as a result of an explosion and fire in a hunting cabin in northern Canada.  Paul Brunner and Douglas Otte are United States citizens who were injured in the fire.  Karen Brunner is the wife of Paul Brunner.  All three sued the Estate of Jerry Jay Hampson, an Ohio resident who died in the fire, as well as the Canadian corporation Canada North Outfitting, Inc. and its Canadian owner, Jerome Knap.  The Hampson Estate then filed a cross-claim against the two Canadian defendants.  In response to a motion for summary judgment filed by Canada North and Knap, the district court dismissed the claims against them for lack of personal jurisdiction.  The district court then certified its order as a final appealable judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.  All of the non-Canadians appealed.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

**A.    Factual circumstances**

The magistrate judge's Report and Recommendation aptly summarizes the background facts, identifying the parties and the alleged tortious acts that gave rise to this diversity case:

> Plaintiffs Paul and Karen Brunner are residents of Missoula, Montana. Plaintiff Douglas Otte is a resident of St. Paul, Nebraska.  Defendant Pamela Hampson is a resident of Fairfield County, Ohio and is the Executrix of the Estate of Jerry Jay Hampson.  Defendant Canada North is an international booking agent and outfitter providing sport hunting excursions in the Province of Nunavut, Canada. Canada North is incorporated under the laws of the Province of Ontario, Canada. Defendant Knap is the owner and sole shareholder of Canada North and is a resident of Almonte, Ontario, Canada.
>
> In February 1999, Thomas Moore, a resident of Ohio, was contacted by Brent Sinclair, a "booking agent" located in Pincher Creek, Alberta regarding a muskox hunt to be offered by Canada North in 2001.  Moore contacted Jerry Hampson to advise him about the hunt.  Moore then booked the hunt for himself, Brunner and Hampson and sent his check and one from Hampson to Sinclair.
>
> Canada North used a cabin in the Ellice River in the Province of Nunavut, Canada, for the muskox hunting trip booked by Thomas Moore, Paul Brunner and Jerry Hampson.  On August 26, 2001, Jerry Hampson, while in the cabin, placed a pot on a Coleman stove and it caught on fire.  Hampson then grabbed a container with clear liquid which he threw on the flames.  The liquid, however, was naphtha, a highly flammable substance, which caused an explosion.  The cabin caught fire. As a result of this fire, Hampson died, and plaintiffs Paul Brunner and Otte suffered severe burns.
>
> A fire investigation concluded that: (1) the hunting party was accommodated in an inadequate hunting camp that was neither inspected nor licensed for commercial operation; (2) camp safety orientation was not provided; (3) portable fire extinguishers were not provided; and (4) the Coleman camp stove was operated contrary to manufacturer's instructions.  Additionally, plaintiffs allege that Jerry Hampson knew or should have known that pouring liquid on a fire is contrary to notions of basic safety.

In their complaint against the Estate of Jerry Jay Hampson, Canada North, and Jerome Knap, plaintiffs Paul Brunner and Douglas Otte alleged that they suffered physical and psychological injuries as a result of the defendants' negligence. Karen Brunner, the wife of Paul Brunner, sued for loss of consortium. The Hampson Estate filed a cross-claim against Canada North and Knap, asserting claims of negligence and wrongful death. For the sake of simplicity, all of the U.S. citizens with claims and cross-claims against the Canadian defendants will be referred to collectively as the "appellants." The men who were in the cabin during the fire and explosion will be referred to as the "hunters."

Canada North and Knap filed a motion to dismiss for lack of personal jurisdiction. The motion was referred to a magistrate judge, who issued a recommendation that the Canadian defendants be dismissed. Despite objections by the appellants, the district court adopted the recommendation and dismissed the Canadian defendants for lack of personal jurisdiction. The Hampson Estate then moved under Rule 54(b) of the Federal Rules of Civil Procedure for the district court's order to be certified as a final appealable judgment. There was no opposition, and the district court granted the motion. This timely appeal followed, but only as to Canada North and not as to Knap.

## B.     Jurisdictional contacts

Four categories of Canada North's and Knap's contacts with Ohio are arguably relevant to the question of whether the district court had personal jurisdiction over them: (1) contacts by Brent Sinclair, the alleged agent of Canada North, with the state of Ohio involving the hunters, (2) contacts by Canada North itself with the state of Ohio involving the hunters, (3) Canada North's contacts with Ohio not involving the hunters, and (4) Canada North's other contacts with the United States not involving the hunters.

### 1.     *Contacts of Brent Sinclair, the alleged agent of Canada North, with the state of Ohio involving the hunters*

The first contact with Ohio relating to the hunt at issue came from Brent Sinclair in the form of a fax to Thomas Moore. Moore is not a party to this case, but was in the cabin when the fire took place. The fax suggested that Moore call Sinclair to talk about the details of the hunt. Moore did in fact call Sinclair and later sent deposit checks for himself, Paul Brunner, and Hampson to Sinclair in Canada to reserve spots for the hunt. Sinclair confirmed receipt via fax. Several other telephone calls, faxes, and an email went back and forth between Sinclair and Moore to work out the details of the hunt.

### 2.     *Contacts by Canada North itself with the state of Ohio involving the hunters*

Canada North had several contacts with Ohio other than through Sinclair. One was in the form of a letter sent to Hampson from Canada North containing information about a polar bear hunt and enclosing a brochure about "all of [Canada North's] hunts," which presumably included the hunt at issue. Another contact was through Global Expedition, a wholly owned subsidiary of Canada North that provided travel services for 85% to 90% of Canada North's customers. Global Expedition and Canada North operate out of the same location and use the same telephone number, fax number, and email address. Moore and Hampson contacted Global Expedition at Sinclair's suggestion to make their travel arrangements.

There were then a series of faxes between Canada North and Moore to work out the details of the travel arrangements—airfare, hotel arrangements, costs, and itinerary. Moore spoke with employees of Canada North in several telephone conversations concerning the subject hunt. Jody Gleeson, who was a Canada North employee, actually made the travel arrangements for Moore and

Hampson and mailed the airline tickets and itinerary to the hunters in Ohio. Moore used his credit card to charge the travel costs.

Canada North also maintained a mailing list that included Moore. This mailing list was used to send direct-mail advertisements. Moore received several direct mailings from Canada North, including a brochure advertising the subject hunt.

### 3.     *Canada North's contacts with Ohio not involving the hunters*

In addition to the contacts with Ohio that directly related to the subject hunt, Canada North had other contacts with the state. It placed advertisements in two periodic publications of Safari Club International (SCI), an American organization for hunters. The frequency of the ads was generally two per year. These periodicals were sent to all SCI members, including Moore and Hampson. Moore saw Canada North's ads in Safari Magazine before the subject hunt. The district court, however, determined that the advertisements and the direct mailings did not induce the hunters to participate in the hunt at issue.

The company also offered discounted hunts to two Ohio chapters of SCI in an effort to improve business. Of SCI's total membership, the Brunner brief claims that 698 are located in Ohio. Canada North's advertisements in the periodicals of SCI were thus sent to hundreds of Ohioans each year. Furthermore, the annual direct mailings sent out by Canada North went to at least 70 Ohio residents on its mailing list that at one time contained approximately 18,000 individuals. There were more Ohioans named on the list prior to some being purged in a periodic updating.

Information about Canada North is located on the website of a Texas booking agency at www.bluewaterbiggame.com. The website contains a description of Canada North, its telephone numbers, and pictures from prior hunts. This information was provided by Canada North. Canada North is also listed as an "International Booking Agent[] from Canada" on www.huntingreport.com, along with a short description of the company. This website does not appear to offer any contact information for Canada North.

The Hampson Estate brief also calls attention to the fact that Canada North maintained an insurance policy that provided liability coverage for the "coverage territory" of "Canada and the United States of America (including its territories and possessions)." But Canada North argues that the language in the insurance policy was boilerplate and is not evidence that the company could foresee any liability in Ohio.

### 4.     *Canada North's other contacts with the United States not involving the hunters*

The appellants' briefs extensively discuss contacts of Canada North with states other than Ohio. For example, the briefs note that Canada North has attended SCI exhibitions in Nevada every year for 23 years, has offered discounted hunts to SCI chapters in California, Michigan, Montana, Texas, and Wyoming, and was in attendance at a 1999 meeting of the Foundation for North American Wild Sheep held in Nevada. As set forth below, however, the state-law and constitutional personal-jurisdiction tests are worded exclusively in terms of contacts with *the forum state*. The appellants cite no authority for the proposition that Canada North's contacts with other states should be considered. As such, this category of contacts is not relevant and will not be further discussed.

## II. ANALYSIS

### A.      Standard of review

There is no dispute in this case about the applicable standard of review.  On the basis of pleadings and affidavits, the district court dismissed Canada North for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.  We review its decision de novo. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887-88 (6th Cir. 2002) ("We review de novo a dismissal for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.").

The appellants in this case bear the burden of making out a prima facie case to show that personal jurisdiction exists:

> [T]he party seeking assertion of *in personam* jurisdiction . . . bears the burden of showing that such jurisdiction exists.  When, however, a district court rules on a jurisdictional motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(2) without conducting an evidentiary hearing, the court must consider the pleadings and affidavits in a light most favorable to the plaintiff . . . .  To defeat such a motion, [the party seeking to assert jurisdiction] need only make a prima facie showing of jurisdiction.

*CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1261-62 (6th Cir. 1996) (citations omitted).

### B.      Alleged agency relationship between Brent Sinclair and Canada North

A preliminary matter needs to be addressed before analyzing the personal jurisdiction issue. The appellants rely on a litany of agency-related theories to impute Sinclair's contacts with Ohio to Canada North, including express agency, agency by estoppel, implied agency, and agency by apparent authority.  In response, Canada North cites cases like *Gelfland v. Action Travel Center, Inc.*, 563 N.E.2d 317 (Ohio Ct. App. 1988), for the proposition that "[o]rdinarily, a travel agency is the *customer's* agent to make requested travel arrangements." *Id.* at 319 (emphasis added); *see also Barton v. Wonderful World of Travel*, 502 N.E.2d 715, 716 (Ohio Mun. Ct. 1986) (holding that a travel agent was a "special agent for his customer, the traveler").  Canada North argues on the basis of holdings like these that Sinclair was the agent for the hunters rather than Canada North, so that Sinclair's contacts with Ohio should not be imputed to Canada North.

The agency rules established in the travel-agent cases discussed by the parties, however, did not arise in the context of establishing personal jurisdiction, but instead are a basis for establishing the duty of the travel agent to act in a reasonable manner.  In *Gelfland*, for example, the sentence immediately following the quotation above reads: "Any agent has a duty to accomplish assigned tasks with reasonable care," and is followed by a discussion of whether the travel agency exercised such care in performing its tasks. *Gelfland*, 563 N.E.2d at 319-20.

The question of whether a travel agent's contacts should be imputed to the travel-destination company, thus making the travel agent the agent of the company for personal-jurisdiction purposes, has apparently not yet been answered by Ohio's courts. Ohio courts have already decided that travel agents are the agents of the traveler for tort-liability purposes. *See Gelfland*, 563 N.E.2d at 319-20. Although the Ohio courts might come to the same conclusion both in the context of establishing the duty of the travel agent to act with reasonable care *and* for the purposes of establishing personal jurisdiction, that result does not necessarily follow.  We have no need to resolve the issue, however, because the disposition of this case does not hinge on whether Sinclair was the agent of one party or the other.  Solely for sake of argument, therefore, we will assume that he was the agent of Canada

North and will consider his contacts with Ohio in deciding whether there was personal jurisdiction over Canada North.

**C.      Ohio law of personal jurisdiction**

This court has articulated a two-step inquiry to determine whether a federal district court sitting in a diversity-of-citizenship case can exercise personal jurisdiction over a defendant: (1) whether the law of the state in which the district court sits authorizes jurisdiction, and (2) whether the exercise of jurisdiction comports with the Due Process Clause. *CompuServe*, 89 F.3d at 1262 ("To determine whether personal jurisdiction exists over a defendant, federal courts apply the law of the forum state, subject to the limits of the Due Process Clause of the Fourteenth Amendment. [T]he defendant must be amenable to suit under the forum state's long-arm statute and the due process requirements of the Constitution must be met.") (citations omitted) (alteration in original).

This court has explained that there are two kinds of jurisdiction that can be exercised under Ohio law:

> Jurisdiction may be found to exist either generally, in cases in which a defendant's "continuous and systematic" conduct within the forum state renders that defendant amenable to suit in any lawsuit brought against it in the forum state, or specifically, in cases in which the subject matter of the lawsuit arises out of or is related to the defendant's contacts with the forum.

*Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co.*,  91 F.3d 790, 793 (6th Cir. 1996) (citation omitted).

The appellants do not explicitly state whether they are asserting general or specific jurisdiction, but based on the arguments made in their briefs, we have no doubt that the issue is whether the district court had specific jurisdiction over Canada North.  In particular, the appellants argue that their claims satisfy the "arising from" requirement of the Ohio long-arm statute, which is a requirement in specific-jurisdiction cases but not general-jurisdiction cases. *See Nationwide Mut. Ins.*, 91 F.3d at 793.  Moreover, the facts do not support and the appellants do not argue the proposition that Canada North engaged in "'continuous and systematic' conduct within the forum state." *Id*.  We will therefore address only whether the district court had specific jurisdiction over Canada North.

The Ohio long-arm statute provides that "[a] court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's: (1) Transacting any business in this state; [or] (2) Contracting to supply services or goods in this state . . . ."   Ohio Rev. Code § 2307.382(A).  Furthermore, specific jurisdiction under the statute requires that the injury arise out of the contacts with Ohio. Ohio Rev. Code § 2307.382(C) ("When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him.").

*1.        Whether Canada North "transact[ed] any business" or "contract[ed] to supply services or goods" in Ohio*

Only the Hampson Estate argues that Canada North contracted to supply services or goods in Ohio, which would subject it to jurisdiction under Ohio Revised Code § 2307.382(A)(2).  This argument is easily dismissed.  The Hampson Estate's brief does not provide any factual basis to show that Canada North supplied any goods in Ohio.  Moreover, it does not explain what services Canada North allegedly provided there.  Canada North's services consisted of arranging travel to the location of the hunt and providing hunt-related support once the hunters were on site in Canada. The magistrate judge's Report and Recommendation properly determined that "while the travel

service, *i.e.*, flight from Columbus, Ohio to Canada, may have occurred, in part, in Ohio, the defendants' services in arranging for that travel presumably occurred in Canada."

Both appellants' briefs, on the other hand, argue that Canada North transacted business in Ohio, allegedly subjecting it to jurisdiction under Ohio Revised Code § 2307.382(A)(1). The Ohio Court of Appeals has held that "[t]he term 'transacting any business' as used in . . . the statute . . . will be given broad interpretation." *Ricker v. Fraza/Forklifts of Detroit*, 828 N.E.2d 205, 209 (Ohio Ct. App. 2005) (citation omitted). Because, as set forth below, we conclude that the appellants' causes of action did not arise out of Canada North's contacts with Ohio, a ruling on the question of whether those contacts constituted the transaction of business in Ohio is not necessary in this case. We will therefore assume without deciding that Canada North did transact sufficient business in Ohio to satisfy the long-arm statute.

> **2.      *Whether the appellants' causes of action arose out of Canada North's contacts with Ohio***

Regardless of whether the basis for long-arm jurisdiction is transacting business or contracting to supply services or goods in Ohio, the party asserting specific jurisdiction must also prove that the cause of action arose from the defendant's contacts with the state. Ohio Rev. Code § 2307.382(C). The contacts that Canada North and Sinclair had with Ohio in this case essentially consisted of communications that led to the hunters booking a trip to Canada.

At the outset, we must address a Sixth Circuit case that appears to be, but is in fact not, controlling. The appellants rely upon *Creech v. Roberts*, 908 F.2d 75 (6th Cir. 1990), in support of their argument that their causes of action arise out of Canada North's contacts with Ohio. In *Creech*, an Ohio resident sued an Oklahoma medical center on the basis of malpractice and a lack of informed consent. *Id.* at 77-78. The center argued on appeal that the district court in Ohio lacked personal jurisdiction over it. *Id.* at 78. In addressing this claim, the court merged the Ohio long-arm jurisdiction and Due Process inquiries:

> Because it is a settled proposition of Ohio law that [this] portion of the long-arm statute . . . was intended to extend to the constitutional limits of due process, we must determine whether a decision that the [defendants] transacted business in Ohio would violate due process.

*Id.* at 79 (citing *In-Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220, 224-25 (6th Cir. 1972)). The district court went on to set forth the three-step analysis that the Sixth Circuit utilizes to determine whether exercising personal jurisdiction would violate due process. *Id.* Briefly, these three steps are whether there was purposeful availment, whether the cause of action arose out of the contacts with the state, and whether exercising jurisdiction would be reasonable. *Id.* In discussing the second prong—whether the cause of action arose from the defendant's activities in the forum state—the court took a lenient "but for" approach:

> If the "Expect a Miracle" program had not been televised in Ohio, Creech would never have become interested in seeking healing at the Center, would never have seen the phone number to call to make an appointment at the Center, and would never have undergone surgery at the Center. Because her exposure to the program brought her into contact with the Center, the Court finds that her cause of action did arise from the Center's activities in Ohio.

*Id.* at 80. The *Creech* court thus performed only a federal constitutional analysis in deciding whether Creech's claim arose from the Center's contacts with Ohio. *Id.* at 79

We conclude that *Creech* does not control the state-law jurisdictional issue in the present case because, four years after *Creech* was decided, the Ohio Supreme Court in *Goldstein v. Christiansen*, 638 N.E.2d 541, 545 n.1 (Ohio 1994), held that the long-arm statute does *not* extend to the limits of the Due Process Clause, and that the two issues must be analyzed *separately*. The *Goldstein* court explicitly rejected the argument that "the General Assembly intended the long-arm statute 'to give Ohio courts jurisdiction to the limits of the Due Process Clause'" because "that interpretation would render the first part of the court's two-part analysis nugatory."  *Id*. at 544-45 & n.1.   In effect, *Goldstein*'s interpretation of Ohio's long-arm statute overrules the contrary analysis of Ohio law set forth in *Creech.  See Clark v. Chubb Group of Ins. Cos.*, 337 F.3d 687, 695 n.5 (6th Cir. 2003) ("All of our decisions in diversity cases are efforts to apply state law; we welcome clarifications of state law by the Ohio Supreme Court."); *Charney v. Thomas*, 372 F.2d 97, 99 (6th Cir. 1967) ("In any event, in a diversity case we are bound by the latest pronouncements of a state Supreme Court.").

Even though we are not bound by *Creech*'s Due Process Clause "arising from" analysis after *Goldstein*, we must still decide whether the Ohio courts would interpret the "arising from" requirement of the long-arm statute more narrowly than the "arising from" requirement of the Due Process Clause.  There are two statutory requirements for long-arm jurisdiction under the long-arm provision at issue in *Goldstein*: (1) that the defendant "transact[ed] any business" in Ohio "directly or by an agent," and (2) that the case deals with a "cause of action arising from" the business transacted in Ohio.  Ohio Rev. Code § 2307.382(A)(1).  *See also* Ohio Rev. Code § 2307.382(C) (further detailing the "arising from" requirement).  By holding that the long-arm statute was narrower than the scope of personal jurisdiction allowed by the Due Process Clause, the *Goldstein* court necessarily concluded that the difference in scope manifested itself in either one or both of the two prongs set forth above.  That is, either the arising-from prong of the long-arm statute is narrower than the arising-from prong of this circuit's Due Process Clause test, or the transacting-business prong of the long-arm statute narrows the scope of jurisdiction from that allowed by the Due Process Clause, or both.

Because we know that the Ohio courts interpret the "transacting business" prong broadly, *see Ricker*,  828 N.E.2d at 209, we are left with the logical inference that Ohio's long-arm statute has less reach than the Due Process Clause because of a more restrictive interpretation of the "arising from" prong.  We thus conclude that the Ohio Supreme Court in *Goldstein* rejected *Creech*'s "but for" approach under the Due Process Clause and that the long-arm statute requires a "proximate cause" relationship between a plaintiff's personal injury claim and the defendant's conduct in Ohio.

Our understanding of the tighter "fit" required by the long-arm statute in order for a claim to arise from a defendant's conduct of business in Ohio is fully consistent with two district court decisions that have interpreted Ohio law in analogous circumstances.  One is *Coleman v. Chen*, 712 F. Supp. 117, 117-19 (S.D. Ohio 1988), in which Coleman, an Ohio resident, brought suit in Ohio against the Chens, who were California franchisees of Holiday Inn hotels.  While on vacation in California, Coleman stayed in the Chens' Holiday Inn hotel in Pasadena and allegedly slipped and fell in the parking lot.  *Id*. at 119.  Coleman argued that the Ohio long-arm statute was satisfied based on Holiday Inn's advertisements in the state of Ohio.  *Id*. at 120.  In support of her claim, Coleman asserted that she had decided to stay at the Chens' hotel in part because of those advertisements.  *Id*. at 120-21.  The Chens brought a motion to dismiss for lack of personal jurisdiction.  With respect to the Ohio long-arm statute's requirement that the cause of action arise out of the defendants' contacts with the state, the district court held as follows:

> [I]t cannot be said that Plaintiff's personal injury action arose from any solicitation by Defendants Chen. The circumstances which may have caused her injury are unrelated to the solicitation. *Plaintiff's injury did not arise from Defendant Chens'*

> *advertising, but (allegedly) from the condition of the Pasadena Holiday Inn's parking lot.*

*Id*. at 122 (parenthetical in original) (emphasis added).

The other decision on point is *Cruz v. Kentucky Action Park, Inc.*, 950 F. Supp. 210, 212 (N.D. Ohio 1996), in which Ohio resident Cruz traveled to Kentucky to visit an amusement park. Cruz was injured while riding down a slide in a cart that had a mechanical failure, and he sued the park in the Northern District of Ohio. *Id*. In addressing the question of whether Cruz satisfied the Ohio long-arm statute, the court noted the various advertising materials that the park had distributed in Ohio. *Id*. at 213. The court then ruled as follows:

> It cannot be said that the purported injuries arose from any solicitation by Defendant. Rather, the purported injuries may have arisen from the condition of Defendant Alpine Slide in the state of Kentucky. The connection between the Defendant's mere solicitation and the Plaintiff's alleged injuries are too tenuous to assert this Court's jurisdiction. This Court concludes that Plaintiff has failed to meet the requirements of Ohio's long arm statute, O.R.C. § 2307.382.

*Id*. at 214.

Turning now to the case before us, the claims alleged against Canada North are for negligence, loss of consortium, and wrongful death. These claims are based on allegations that Canada North provided inadequate and unsafe facilities and equipment at the Canadian hunting camp. As in *Coleman* and *Cruz*, the injuries to the appellants in the present case "did not arise from" Canada North's advertising or solicitation of business in Ohio, "but (allegedly) from the condition" of the facilities and equipment provided by Canada North at the site of the hunt. *See Coleman*, 712 F. Supp. at 122 (parenthetical in original); *Cruz*, 950 F. Supp. at 214. As in *Coleman*, this is true even though the hunters' decision to go to Canada in the first place presumably resulted from Canada North's solicitations in Ohio. *See Coleman*, 712 F. Supp. at 120-21. A "but for" relationship between the solicitation and the injuries clearly exists, but one cannot reasonably say that the solicitations in Ohio were the proximate cause of the fire and explosion at the cabin in Canada. *See id*. at 122; *Cruz*, 950 F. Supp. at 214. We therefore hold that the connection between Canada North's contacts with Ohio and the injuries that give rise to the complaints in this case is simply too tenuous to sustain personal jurisdiction against Canada North. *See id.*

**D.    Due process limitation on the exercise of personal jurisdiction**

As set forth above, we hold that the Ohio long-arm statute is not satisfied in this case. We thus have no reason to analyze whether the Fourteenth Amendment's Due Process Clause is a limitation on the exercise of personal jurisdiction. *See Hall v. Tucker*, 829 N.E.2d 1259, 1266 (Ohio Ct. App. 2005) (stating that after the state long-arm statute is satisfied, "*[t]hen*, the court must decide whether granting jurisdiction under the statute . . . would deprive the defendant of the right to due process of law pursuant to the Fourteenth Amendment to the United States Constitution") (emphasis added).

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.